UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA ex rel. RONALD KLINER, | ) ) ) | |
| Petitioner, | ) ) | |
| v. | ) ) | No. 08 C 3134 |
| TERRY MCCANN, Warden, | ) ) | The Honorable John W. Darrah, |
| Respondent. | ) | Judge Presiding. |

## <u>MOTION TO DISMISS</u>

Pursuant to Rule 4 of the Rules Governing Section 2254 Cases in the United States District Courts,[1] and 28 U.S.C. § 2244(d)(1), respondent TERRY MCCANN moves to dismiss the above-captioned Petition for Writ of Habeas Corpus as time-barred, and states as follows:

1.    Petitioner Ronald Kliner is currently in the custody of Terry McCann, Warden of the Stateville Correctional Center, located in Joliet, Illinois, and is identified as prisoner number B77152.

---

[1]  Rule 4 of the Rules Governing Section 2254 Cases in the United States District Courts contemplates that the respondent's response to the petition may be by "motion, or other response." *See* Advisory Committee Notes to Rule 4, 2004 Amendments ("[t]he amended rule [4] reflects that the response to the habeas petition may be a motion"); *see also* Advisory Committee Notes to Rule 5, 2004 Amendments (Rule 4 permits the filing of pre-answer motions to dismiss, and "reflects the view that if the court does not dismiss the petition, it may require (or permit) the respondent to file a motion").

2.      Following a jury trial in the Circuit Court of Cook County, Illinois,

petitioner was convicted of two counts of first degree murder and one count of

conspiracy to commit murder.  (Resp. Exh. D, *People v. Kliner*, 705 N.E.2d 850, 861

(Ill. 1999)).  Petitioner waived a jury for his capital sentencing hearing, and the

trial court sentenced petitioner to death.  (*Id.*).  On direct appeal to the Supreme

Court of Illinois, the Court found that the evidence at trial showed:

> [A]round 12:30 a.m. on February 18, 1988, two neighbors, John and
> Deborah Fostin, discovered the body of Dana Rinaldi in her car located
> in the parking lot of the Wyndham Court apartment complex in
> Palatine, Illinois.  Dana had lived in that apartment complex with her
> husband, Joseph Rinaldi. . . .  Dana, while seated in her car, had been
> shot five times in the face and head. . . .  Three gunshot wounds to her
> hands also suggested that Dana had raised her hands in front of her
> face in an attempt to protect herself.

> ***

> No arrests were made in the case until June 10, 1993 following grand
> jury testimony by Tammy Behenna, [petitioner's] former girlfriend,
> and John Apel, Sr., [petitioner's] uncle. . . .  Joseph Rinaldi also
> testified in exchange for, among other things, the prosecutor's promise
> to recommend a 40-year sentence, although he later received a
> sentence of 60 years' imprisonment after pleading guilty to murder,
> conspiracy, and solicitation.  Rinaldi . . . had married Dana in 1980,
> and they began having marital problems in the fall of 1987 when the
> couple was deeply in debt.  About this time, Rinaldi began meeting
> with Michael Permanian, a close friend since childhood who had served
> as best man at his wedding,  Rinaldi indicated to Perimanian that he
> was having marital problems and wanted to have his wife killed
> because divorce was not an option given their debts.  Permanian
> suggested that Rinaldi meet with [petitioner] because [petitioner]
> might be able to help Rinaldi with his problem.  Rinaldi also had been
> acquainted with [petitioner] since his childhood.

> ***

2

Prior to the murder, Rinaldi met with both Pemanian and [petitioner], both of whom agreed to kill Dana. [Petitioner] even pointed to a gun tucked in his waistband when Rinaldi asked how he would do it. Rinaldi informed them that he wanted it to look like a botched robbery attempt and [petitioner] and Permanian agreed. Rinaldi provided [petitioner] and Permanian with background information regarding Dana's employment and their apartment complex, the Wyndham Court Apartments. Rinaldi drew a map of the complex indicating the exact location where Dana usually parked her car. Rinaldi also informed [petitioner] and Permanian about a $50,000 life insurance policy he had obtained on Dana's life and agreed to give them half of those proceeds. After investigating the matter, [petitioner] and Permanian reported to Rinaldi that the apartment complex was the best place to kill Dana. [Petitioner] and Permanian announced that they planned to commit the murder on February 17, 1988, and Permanian indicated that they would steal a car. Permanian suggested that Rinaldi go out on the night of the murder and page him as soon as he was finished talking to the police.

*\*\**

Rinaldi . . . called his friend Jim Groszka and persuaded him to go drinking with him in downtown Chicago on the night of February 17, 1988. Groszka later corroborated this . . ., adding that he was surprised by Rinaldi's call and agreed to go out because Rinaldi was insistent. Groszka . . . and Rinaldi were together at several bars in Chicago from 9 p.m. on February 17, 1988, until about 4 a.m. on February 18, 1988.

*\*\**

On February 17, 1988, Rinaldi visited his wife at work . . . and took her out to dinner. Jennifer Sparesus, one of Dana's coworkers, corroborated Rinaldi's testimony regarding his visit at the office, and his announcement that he was going downtown later that night. Dana returned to the office after dinner. Sparesus . . . last saw Dana around midnight when Dana indicated that she was going home.

*\*\**

Rinaldi . . . returned home sometime after 4 a.m. Upon arriving home, Rinaldi knew the murder had been carried out because he saw Dana's car being towed away.

***

Following the murder, Rinaldi . . . received more insurance proceeds than he originally anticipated. Rinaldi received approximately $137,000. Rinaldi had originally agreed to pay [petitioner] and Permanian $25,000, and he did not immediately inform them of the additional funds. Rinaldi began making weekly payments to [petitioner] and Permanian shortly after the murder. Permanian later contacted Rinaldi and informed him that he and [petitioner] had learned about the additional insurance proceeds. Rinaldi agreed to pay [petitioner] and Permanian $55,000. Rinaldi had meetings with [petitioner] and Permanian regarding the insurance proceeds. Rinaldi . . . was threatened by [petitioner] and Permanian with respect to making payments to them and speaking to the police.

***

[O]n September 28, 1993, while [Rinaldi], [petitioner] and Permanian were in a holding cell awaiting transportation for a court appearance, Permanian talked about how he and [petitioner] had driven to Indiana at speeds exceeding 100 miles per hour after the murder, where they disposed of the clothes and gun used to commit the murder. Both [petitioner] and Permanian were laughing as they recalled how officers had dragged Lake Michigan looking for the gun.

***

Rinaldi further recounted how, in late October, while all three men were in a lockup, Rinaldi saw [petitioner] and Permanian reenact the murder. Permanian sat on a bench while [petitioner] stood over him, [petitioner's] hand pointed at Permanian's head, and [petitioner's] index finger stuck out as if he were holding a gun. After Permanian put his hand up by his face, [petitioner] indicated that was how he shot Dana.

***

Tammy Behenna . . . met [petitioner] in 1987. [Petitioner] and Behenna occasionally spent the night at her apartment prior to moving in together in October, 1988. They lived together until July 1, 1991. [Petitioner] and Behenna had a child together. . . . According to Behenna, [on the night of the murder, petitioner] got up around 11 p.m. and put on a suit. [Petitioner] then left the apartment and did

4

not return that night.  [Petitioner] called Behenna the next morning, February 18, 1988, and informed her that he was okay and was going out to eat.  [Petitioner] returned to the apartment later that morning and went back to bed.  When he heard a radio news report, however, he jumped out of bed and screamed, "That can't be right.  They can't have a suspect."  Behenna overheard [petitioner] then make a phone call, during which he mentioned the name "Mike."  Later that day, [petitioner] called Behenna at her office and informed her that he had to meet "Mike" and that "they were going to make a deposit in Lake Michigan."  On the evening of February 18 or 19, 1988, [petitioner] asked Behenna to listen to a tape recording of a conversation between Permanian and Rinaldi.  [Petitioner] asked her if Rinaldi sounded like a man who had spent two months practicing his crying.  Behenna recalled that [petitioner] made a lot of phone calls on February 18 and 19, and that he clipped a lot of newspaper articles about the Rinaldi murder.

***

[W]hen [Behenna] was subpoenaed to appear before the grand jury in April of 1988, she claimed the fifth amendment privilege, as [petitioner] had advised her, and refused to testify.  Behenna testified that when she was served with the subpoena to appear before the grand jury, [petitioner] informed her that people can die in a number of ways, including being struck by a car while crossing the street.  [Petitioner] then had Behenna cross the street to mail a letter.

***

[Petitioner] had a conversation with [Behenna] about the Rinaldi murder in August of 1988, when they visited Great America amusement park.  [Petitioner] said to Behenna that "I want you to picture this.  It's cold outside.  It's late.  It's dark . . . somebody is just coming home from work. . . .  And I walk up to her car and point a gun at her.  And she says 'what are you doing?'  And then she put her hand up, and then I shot her five times."  Behenna stated that [petitioner] was smiling when he relayed this information to her.  Behenna also recounted that, in July of 1990, [petitioner] walked up to her, put his finger to her head, and impersonated a woman's voice as he said: "What are you doing?"  [Petitioner] then said "bang" five times.

***

5

[S]ometime in February of 1988, or the fall of 1989, [petitioner] mentioned Joe Rinaldi and that he was angry with Rinaldi and that he wanted Rinaldi to pay him for a job he had done. In the fall of 1989, Behenna saw [petitioner] kneeling on the floor of their bedroom, counting what appeared to be a large amount of cash. [Petitioner] looked at the money and asked, "Is this worth a life?"

\*\*\*

John Apel, Sr., [petitioner's] uncle and a Chicago police officer, . . . testified about a number of incriminating statements [petitioner] made to him. On February 18, 1988, around 6 p.m., [petitioner] called him at home and told him to watch the news that night. Apel did so and heard an account of the Rinaldi murder. [Petitioner] called him again that night to confirm Apel had watched the news, and [petitioner] specifically referred to the murdered girl in Palatine, at which time [petitioner] began laughing.

\*\*\*

Sometime in May of 1988, [petitioner] unexpectedly arrived at Apel's home. [Petitioner] honked the horn repeatedly and drove partially onto Apel's driveway and his neighbor's lawn. [Petitioner] admitted to Apel that he had killed Dana Rinaldi and provided details, including how he had stuck a gun to her head and pulled the trigger, and how she had thrown up her arms with a terrified look on her face. [Petitioner] relayed that he laughed when he shot her in the head. [Petitioner] also told Apel that the gun had jammed at one point. After relaying this information, [petitioner] threatened that he would kill the members of the Apel family if his uncle said anything.

\*\*\*

Apel's son, John Floyd Apel, . . . corroborated his father's testimony about the conversation in the driveway of the Apel home in May of 1988. He also testified that he was present for another conversation with [petitioner] in which [petitioner] stated that "he could kill anyone just like he had killed the Rinaldi girl."

\*\*\*

> After considering the aforementioned evidence, the jury returned
> verdicts finding [petitioner] guilty of murder and conspiracy to commit
> murder.

(*Id.* at 862-66).

3.    Because petitioner was sentenced to death, he appealed directly to the

Illinois Supreme Court.  On December 3, 1998, the Illinois Supreme Court affirmed

petitioner's conviction and sentence.  (*Id.*).  On October 4, 1999, the United States

Supreme Court denied petitioner's petition for writ of certiorari.  (Resp. Exh. E,

Order denying petition for writ of certiorari to the Supreme Court of Illinois in

*Kliner v. Illinois*, 528 U.S. 830 (1999)).  Then Governor George Ryan subsequently

commuted petitioner's death sentence to a term of natural life.  (Resp. Exh. I, Order

in *People v. Kliner*, No. 1-04-0050 (Ill.App. Dec. 29, 2006)).

4.    Prior to the Illinois Supreme Court's denial of petitioner's direct

appeal, on September 5, 1997, petitioner filed a pro se postconviction petition.  (*Id.*).

Counsel filed an amended petition on May 25, 2001.  (*Id.*).  On September 19, 2002,

the circuit court granted the State's motion to dismiss three of petitioner's four

claims.  (*Id.*).  Following an evidentiary hearing, the circuit court dismissed

petitioner's fourth claim.  (*Id.*).

5.    On December 29, 2006, the Illinois Appellate Court affirmed the

judgment of the circuit court.  (Resp. Exh. I).  Petitioner did not file a timely

petition for leave to appeal (PLA) in the Illinois Supreme Court.  On February 8,

2007, petitioner filed a motion for leave to file a PLA instanter.  (Resp. Exh. J,

Motion for leave to file petition for leave to appeal instanter in *People v. Kliner*, No. 104166).  On February 20, 2007, the Illinois Supreme Court granted that motion. (Resp. Exh. K, Order granting motion in *People v. Kliner*, No. 104166 (Ill. Feb. 20, 2007)).  On May 31, 2007, the court denied petitioner's PLA.  (Resp. Exh. M, Order denying PLA in *People v. Kliner*, 871 N.E.2d 59 (Table) (Ill. 2007)).

6.    On May 30, 2008, petitioner filed the instant habeas petition, arguing: (1) trial counsel was ineffective; (2) appellate counsel was ineffective; (3) the trial court engaged in improper ex parte communications with jurors; (4) he was denied his constitutional right to a speedy trial; (5) the trial court improperly limited his ability to cross-examine witnesses; (6) the prosecutor's closing argument improperly referred to facts not in evidence in petitioner's trial; (7) the trial court admitted improper hearsay evidence; (8) the trial court admitted improper other-crime evidence against petitioner; (9) the prosecutor's opening statement improperly referenced facts that he could not establish at trial; (10) the prosecutor's closing argument improperly referenced petitioner's failure to testify; (11) the trial court improperly denied petitioner a motion regarding ex parte communication between the judge and the Sheriff's Department regarding threats made by petitioner against the trial judge's safety; (12) the above errors, cumulatively, denied petitioner a fair trial; and (13) petitioner is actually innocent.

7.    The following state court materials deemed relevant by respondent have been manually filed as exhibits to this motion under separate cover:

Exhibit A:    Brief and argument for defendant-appellant in *People v. Kliner*, No. 81314;

Exhibit B:    Brief and argument for plaintiff-appellee in *People v. Kliner*, No. 81314;

Exhibit C:    Reply brief and argument for defendant-appellant in *People v. Kliner*, No. 81314;

Exhibit D:    *People v. Kliner*, 705 N.E.2d 850 (Ill. 1999);

Exhibit E:    Order denying petition for writ of certiorari to the Supreme Court of Illinois in *Kliner v. Illinois*, 528 U.S. 830 (1999);

Exhibit F:    Brief and argument for petitioner-appellant in *People v. Kliner*, No. 1-04-0050;

Exhibit G:    Brief and argument for respondent-appellee in *People v. Kliner*, No. 1-04-0050;

Exhibit H:    Reply brief and argument for petitioner-appellant in *People v. Kliner*, No. 1-04-0050;

Exhibit I:    Order in *People v. Kliner*, No. 1-04-0050 (Ill.App. Dec. 29, 2006);

Exhibit J:    Motion for leave to file PLA instanter in *People v. Kliner*, No. 104166;

Exhibit K:    Order granting motion in *People v. Kliner*, No. 104166 (Ill. Feb. 20, 2007);

Exhibit L:    PLA in *People v. Kliner*, No. 104166; and

Exhibit M:    Order denying PLA in *People v. Kliner*, 871 N.E.2d 59 (Table) (Ill. 2007).

8.    The claims raised in the instant petition should be dismissed, with prejudice, because the petition is untimely under 28 U.S.C. § 2244(d)(1), which

imposes a one-year statute of limitations for filing habeas petitions.  Section 2244(d)

provides as follows:

> (1)    A 1-year period of limitation shall apply to an application for writ of habeas corpus by a person in custody pursuant to the judgment of a State court.  The limitation period shall run from the latest of –
>
>> (A)    the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;
>>
>> (B)    the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;
>>
>> (C)    the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or
>>
>> (D)    the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.
>
> (2)    The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection.

28 U.S.C. § 2244(d).  Petitioner does not assert that his time limit is governed by

any of the events listed in 28 U.S.C. § 2244(d)(1)(B)-(D); therefore, respondent

calculates the timeliness of the petition under § 2244(d)(1)(A), which instructs that

a habeas petitioner shall file his petition no more than one year after the date on

which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review.

9.    Petitioner sought certiorari, which was denied on October 4, 1999. (Resp. Exh. E); 28 U.S.C. § 2244(d)(1)(A).  Therefore, petitioner was required to file his habeas petition on or before October 4, 2000.  *See* Fed. R. Civ. P. 6(a); *see also Newell v. Hanks*, 283 F.3d 827, 833 (7th Cir. 2002)(holding that Rule 6(a) applies to the calculation of AEDPA's one-year grace period for petitioners whose convictions became final prior to April 24, 1996); *United States v. Marcello*, 212 F.3d 1005, 1009-10 (7th Cir. 2000)(relying on Rule 6(a) to adopt "anniversary method" of calculating AEDPA's limitations period for § 2255 petitioners).

10.    Petitioner filed a collateral attack against his conviction in state court on September 5, 1997, before his conviction became final.  (Resp. Exh. I).  The statute of limitations is tolled during the time that "a properly filed application for State post-conviction [relief] . . . is pending."  *Gutierrez v. Schomig*, 233 F.3d 490, 492 (7th Cir. 2000); 28 U.S.C. §2244(d)(2).  Petitioner's postconviction petition was properly filed on September 5, 1997.  (Resp. Exh. I).  Therefore, the statute of limitations was tolled between the filing of the postconviction petition and December 29, 2006, when the appellate court affirmed the dismissal of his postconviction petition.  (Resp. Exh. I).  Because petitioner did not file a timely PLA, he had no properly filed state court proceeding pending from December 29, 2006, until February 8, 2007, when he filed his motion for leave to file his PLA instanter.  (Resp. Exh. J);  *See Fernandez v. Sternes*, 227 F.3d 977, 978-81 (7th Cir.

11

2000); *Willhite v. Walls*, 241 F.Supp.2d 882, 887 (N.D. Ill. 2003).  Thus, the statute of limitations ran for 41 days.  *Fernandez*, 227 F.3d at 978-81; *Willhite*, 241 F.Supp.2d at 887.  The statute of limitations was then tolled until May 31, 2007, when the Illinois Supreme Court denied petitioner's PLA.  (Resp. Exh. M).  The statute of limitations ran for 365 more days, until May 30, 2008, when petitioner filed the instant habeas petition.[2]  Petitioner's statute of limitations ran for a total of 406 days, exceeding the one year limit.  Accordingly, the instant petition is untimely.

14.     Respondent is aware of no basis to equitably toll the limitations period. The "very availability of equitable tolling for habeas corpus petitioners is dubious in [the Seventh Circuit]."  *Williams v. Buss*, __ F.3d __, No. 07-1092, 2008 WL 3519569, *2 (7th Cir. Aug. 14, 2008).  Assuming that equitable tolling is available, it is proper only "when extraordinary circumstances outside the petitioner's control prevent timely filing" of the habeas petition.  *Gildon v. Bowen*, 384 F.3d 883, 887 (7th Cir. 2005).  No such extraordinary circumstances are evident here.

15.     Because petitioner filed his habeas petition beyond the limitations period provided by § 2244(d)(1), it is untimely, and this Court should dismiss it with prejudice.

---

[2]  Because petitioner has counsel in the instant matter, he is not entitled to the benefit of the mailbox rule.  *See United State v. Kimberlin*, 898 F.2d 1262, 1265 (7th Cir. 1990) (holding mailbox rule does not apply to prisoner represented by counsel).

## <u>CONCLUSION</u>

This Court should dismiss the instant Petition for Writ of Habeas Corpus as time-barred.  If this Court determines that the instant petition is not time-barred under 28 U.S.C. § 2244(d), respondent respectfully requests 30 days from the entry of the Court's order denying this motion to address any defenses to and/or the merits of petitioner's claims in a subsequent submission.

September 5, 2008                          Respectfully submitted,

                                           LISA MADIGAN
                                           Attorney General of Illinois

                                           <u>s/ Garson Fischer</u>
                                           GARSON FISCHER, Bar # 6286165
                                           Assistant Attorney General
                                           100 West Randolph Street, 12th Floor
                                           Chicago, Illinois 60601-3218
                                           TELEPHONE:  (312) 814-2566
                                           FAX:  (312) 814-2253
                                           E-MAIL:  gfischer@atg.state.il.us

## CERTIFICATE OF SERVICE

I hereby certify that on September 5, 2008, I electronically filed respondent's **Motion to Dismiss** with the Clerk of the United States District Court for the Northern District of Illinois, Eastern Division, using the CM/ECF system, which will send electronic notice to the following registered party, counsel for petitioner:

Jonathan I. Loevy
The Exoneration Project
6020 South University Avenue
Chicago, Illinois 60637

s/ Garson Fischer
GARSON FISCHER, Bar # 6286165
Assistant Attorney General
100 West Randolph Street, 12th Floor
Chicago, Illinois 60601-3218
TELEPHONE: (312) 814-2566
FAX: (312) 814-2253
E-MAIL: gfischer@atg.state.il.us