UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

RONALD KLINER,                          )
                                        )
            Petitioner,                 )
                                        )            No. 08 C 3134
      v.                                )
                                        )            Judge John W. Darrah
TERRY MCCANN,                           )
Warden of Stateville Correctional Center, )
                                        )
            Respondent.                 )

## MEMORANDUM OPINION AND ORDER

Petitioner, Ronald Kliner, was convicted in the Circuit Court of Cook County, Illinois, of

two counts of first-degree murder and one count of conspiracy to commit murder. Before the

Court is Petitioner's Petition for Writ of *Habeas Corpus*, brought pursuant to 28 U.S.C. § 2254.

## BACKGROUND

The following background is based on the Illinois appellate court's decision on

Petitioner's post-conviction appeal.

Around 12:30 a.m. on February 18, 1988, the body of Dana Rinaldi ("Dana") was found

in her car in the parking lot of the apartment complex in Palatine, Illinois, where she and her

husband, Joseph Rinaldi ("Rinaldi"), had lived. Dana, while seated in the car, had been shot five

times in the face and head. Gunshot wounds to her hands suggested that Dana had raised her

hands in front of her face in an attempt to protect herself.

Rinaldi and Dana had married in 1980. They began having marital problems in the fall

of 1987 when the couple was deeply in debt. About that time, Rinaldi began meeting with

Michael Permanian, a close friend since childhood who had served as best man at the Rinaldi's

wedding. Rinaldi told Permanian that he was having marital problems and wanted his wife killed since divorce was not an option due to their debts. Permanian suggested that Petitioner might be able to help Rinaldi with his problem. At a meeting with Rinaldi, both Permanian and Petitioner agreed to kill Dana. Rinaldi agreed to give Permanian and Petitioner half of a life insurance policy he had obtained on Dana's life. Petitioner and Permanian informed Rinaldi that they planned to commit the murder on February 17, 1988.

On that night, February 17, 1988, Rinaldi visited Dana at work and took her out to dinner. After dinner, Dana returned to the office, where she continued to work until leaving for home about midnight. After dinner, Rinaldi went out drinking with a friend in downtown Chicago from 9:00 p.m. until about 4:00 a.m. the next morning. Rinaldi returned sometime after 4 a.m. to see Dana's car being towed away.

No arrests were made until June 10, 1993, following grand jury testimony by Tammy Behenna, Petitioner's former girlfriend, and John Apel, Sr., Petitioner's uncle. Petitioner, Rinaldi and Permanian were indicted on charges of murder and conspiracy; Rinaldi was also indicted on a charge of solicitation. Rinaldi ultimately pled guilty and testified against Petitioner and Permanian. The jury returned a verdict of guilty against Petitioner. Petitioner waived a jury for his capital sentencing hearing, and the trial court sentenced Petitioner to death.

Because he was sentenced to death, Petitioner appealed directly to the Illinois Supreme Court, which affirmed Petitioner's conviction and sentence. The United States Supreme Court denied Petitioner's petition for writ of certiorari. In 2003, the Governor commuted Petitioner's death sentence to a term of natural life.

While his appeal was pending before the Illinois Supreme Court, Petitioner filed a *pro se* post-conviction petition, which was later amended by counsel. The circuit court granted the State's motion to dismiss with respect to three of Petitioner's four claims and denied the fourth claim after an evidentiary hearing. The Illinois appellate court affirmed the circuit court's decision, and Petitioner's Petition for Leave to Appeal was denied by the Illinois Supreme Court.

Petitioner filed the instant Petition on May 30, 2008.

## LEGAL STANDARD

Under 28 U.S.C. § 2254, a federal court may grant a state prisoner's petition for *habeas* relief only when "the state court's adjudication of the claim

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."

*Smiley v. Thurmer*, 542 F.3d 574, 580 (7th Cir. 2008) (*Smiley*). A state court's decision is contrary to established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decided a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Smiley*, 542 F.3d at 580 (quoting *Williams v. Taylor*, 529 U.S. 362, 413 (2000) (*Williams*)). A state court's decision is an unreasonable application of clearly established federal law "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Smiley*, 542 F.3d at 580

(quoting *Williams*, 529 U.S. at 407). The state court's factual findings are presumed correct, although this presumption can be rebutted by clear and convincing evidence. *Smiley*, 542 F.3d at 580.

Additionally, a petitioner must avoid procedural default of his claims. A federal court will not consider the merits of a state prisoner's *habeas* claim "unless the petitioner presented it in 'one complete round of the State's established appellate review process.'" *Hadley v. Holmes*, 341 F.3d 661, 668 (7th Cir. 2003) (quoting *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999)). Procedural default may be excused if the petitioner shows cause and prejudice or that the default would result in a fundamental miscarriage of justice. *Todd v. Schomig*, 283 F.3d 842, 848 (7th Cir. 2002). A fundamental miscarriage of justice exception applies when "the habeas applicant can demonstrate that the alleged constitutional error has resulted in the conviction of one who is actually innocent of the underlying offense." *Dretke v. Haley*, 541 U.S. 386, 388 (2004) (citing *Murray v. Carrier*, 477 U.S. 478, 495-96 (1986)).

## ANALYSIS

The *habeas* petition before the Court raises the several grounds for relief. Broadly categorized, those grounds are: ineffective assistance of trial counsel, ineffective assistance of appellate counsel, improper rulings by the trial court, improper statements by the prosecution at trial and actual innocence.

### *Ineffective Assistance of Trial Counsel*

Petitioner raises nine separate grounds for finding that he was denied his Sixth and Fifth Amendment rights to effective assistance of counsel. Petitioner claims that his trial attorney: (1) failed to introduce evidence that a hair found on the victim did not match Petitioner, the

victim or Permanian; (2) failed to investigate inconsistencies in Behenna's testimony about Petitioner's alleged confession to her; (3) failed to impeach the testimony of Behenna that she had not come forward earlier because she was afraid of Petitioner; (4) told Petitioner that he would have to find another attorney if he wanted to testify; (5) failed to investigate and present evidence of two possible alibi witnesses for Petitioner the night of the murder; (6) failed to impeach Rinaldi's testimony that Petitioner had made incriminating statements to Rinaldi at the Cook County jail; (7) failed to present evidence that John Apel, Sr. had a motive to falsely accuse Petitioner; (8) failed to introduce evidence that Behenna had a motive to falsely accuse Petitioner; (9) failed to investigate evidence that someone other than Petitioner was the third conspirator.

The State argues that Petitioner has procedurally defaulted the first four of these grounds by failing to argue them before the state appellate court and the Illinois Supreme Court. Petitioner does not dispute that he did not present these grounds for one complete round of state review. However, he argues that he can avoid procedural default on these claims by establishing that a fundamental miscarriage of justice would occur – that is, Petitioner argues that he can show that he is innocent. *See Buie v. McAdory*, 341 F.3d 623, 626-27 (7th Cir. 2003) (*Buie*) ("A defendant who asserts actual innocence as a reason to excuse a procedural default must demonstrate innocence; the burden is his, not the state's, for the state has the benefit of the jury's verdict."). Reviewing the evidence and argument presented by Petitioner, for reasons discussed below, the Court finds Petitioner has not met this burden. Therefore, Petitioner has procedurally defaulted the first four grounds of his ineffective assistance of counsel claim.

The State does not argue that Petitioner's remaining grounds for his ineffective-assistance of trial counsel were procedurally defaulted but, rather, that they are meritless. To prevail on a claim of ineffective assistance of counsel, a petitioner must show (1) that his attorney's performance fell below an objective standard of reasonableness and (2) that, but for counsel's errors, the result of the proceeding would have been different. *Strickland v. Washington*, 466 U.S. 668,687-88, 694 (1984) (*Strickland*). With respect to the first prong, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689. With respect the second prong, "[a] reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.

Petitioner argues that his trial counsel was ineffective for failing to call two alibi witnesses, Patricia Werner and Cynthia Hani. According to Petitioner, Werner would have testified that she was with Petitioner at his office on the night of the murder until approximately 11:50 p.m. to 12:00 a.m. Additionally, Hani would have testified that she was with Petitioner at his office between 11:45 p.m. and 12:00 a.m. on some weeknight in February 1988. Although Hani could not say exactly what date she had visited Petitioner's office, she would have testified that Petitioner had told her that she had just missed someone he wanted her to meet. According to Petitioner, that person was Werner, thus establishing the date of Hani's visit. Additionally, Petitioner faults his trial counsel for failing to introduce evidence of the drive time between his office and the murder scene, which, Petitioner argues, would have established that he could not have committed the murder.

The Illinois appellate court, applying the *Strickland* test, rejected Petitioner's arguments.

With respect to trial counsel's failure to call Cynthia Hani, the appellate court reasoned:

> To begin, we fail to see how it could have been objectively unreasonable for trial counsel to not call Hani when, at best, she could only testify that she was fairly certain that her visit at [Petitioner's] office was on a weeknight in February 1988. Putting such vague, uncertain testimony before the jury would have demonstrated a desperation that could have otherwise undercut the defense. *See Drake v. Clark*, 14 F.3d 351, 356-57 (7th Cir. 1994) (holding that trial counsel was not ineffective for not presenting the testimony of a witness the defendant claimed would corroborate his alibi that he was fixing the witness' car at the time of the offense when the witness had only a vague recollection that his car was repaired in the same year as the offense). . . . Our conclusion is not effected [sic] by [Petitioner's] own averment that he would have set the date of Hani's visit on February 17 and identified the person Hani just missed as Werner. . . . [Petitioner's] credibility would have been devastated by the State's cross-examination. Besides being impeached based on his interest in avoiding execution or incarceration, [Petitioner's] inconsistent versions of the truth, always to his favor in the context of the litigation, would have been brought to the fore. For example, it could only have been brought out before the jury that, in [Petitioner's] motion to suppress, he alleged that he had contact with Rinaldi in jail. . . . Further, in support of the same motion, [Petitioner] also testified that he and Permanian sometimes shared the same bullpen before going to court. Whereas, at trial, [Petitioner's] claim was that the segregation order precluding *any* contact or communication between Rinaldi, Permanian and [Petitioner] was strictly enforced.

*People v. Kliner*, No. 1-04-0050, at 37-38 (Ill. App. Dec. 29, 2006).

The appellate court's decision regarding trial counsel's decision not to call Hani was not contrary to, nor an unreasonable application of, Supreme Court precedent. Petitioner has given no reason to disagree with the appellate court's conclusion that testimony by Hani that she was at Petitioner's office some night in February 1988 would have demonstrated desperation on the part

of the defense. Furthermore, although Petitioner argues that corroborating evidence establishes

that the evening in question was the night of the murder, he does not attempt to dispute the

appellate court's argument that Petitioner's credibility would have been devastated on cross-

examination.

With respect to trial counsel's decision not to call Patricia Werner, the appellate court

wrote:

> Further, with respect to Werner, we perceive that the addition of her testimony
> could not have created the probability of a different result. Though Werner would
> not have been subject to impeachment before the jury on the basis of her marriage
> to [Petitioner], since she was not yet married [to him] at the time, she would,
> nevertheless, have been subject to impeachment for bias as a former girlfriend and
> ongoing business associate. Werner was also, apparently, less than precise with
> her tracking of time in her affidavit. For example, she averred that it was a 30
> minute drive between her home and [Petitioner's] office. Yet, she claimed to
> "arrive[] at [Petitioner's] office at approximately 11:30 p.m.," in spite of the fact
> that [Petitioner's] phone records show that the two were on the phone for 13
> minutes beginning at 10:59, and the fact that she first stopped to see her mother.
> Moreover, Werner could merely aver that she was with [Petitioner] at his office
> for between "twenty to thirty minutes." Lastly, the second call to Werner [made at
> approximately 12:30] came from a mobile phone. This evidence would have
> suggested that [Petitioner] was not in his office around the time of the murder,
> but, rather, on the road, in spite of [Petitioner's] claims to the contrary.

*People v. Kliner*, No. 1-04-0050, at 38-39 (Ill. App. Dec. 29, 2006).

The appellate court's conclusion that the introduction of Werner's testimony would not

have created the probability of a different result was not contrary to, nor an unreasonable

application of, *Strickland.* Petitioner attempts to minimize Werner's potential bias but adds

nothing that the appellate court did not consider.

Finally, with respect to the evidence of drive time between Petitioner's office and the

murder scene, the appellate court wrote:

Finally, we, likewise, cannot detect that trial counsel's failure to investigate and present drive time evidence . . . resulted in any prejudice to [Petitioner]. To begin, for drive time evidence to be of any relevance, the jury would have had to believe Werner's testimony notwithstanding the serious impeachment to which it was susceptible. If the jury were to wholly reject Werner's proffered testimony, then the drive time evidence would have allowed the jury to perceive a large window of time in which [Petitioner] could have comfortably made the trip to the crime scene. The last telephone call preceding the murder made from a land based line in [Petitioner's] office was at 10:59 p.m. on February 17, 1988; the next call from that land line was at 2:21 a.m. on February 18. Further, even if the jury were to have accepted Werner's averments in the best light possible for [Petitioner], so that he would have been in his office at midnight, [Petitioner] still would have had sufficient time to reach the crime scene. As noted, the murder was believed to have occurred at some point between 12:10 and 12:55 a.m. on the morning of February 18, 1988. The jury would not have been obligated to conclude that the drive time to Palatine would have taken as long as [Investigator] Lyon's averments suggested. The averments themselves reveal that estimated drive times are subject to significant variation; Lyon's second drive, though two-and-a-half miles longer in distance, was over seven minutes shorter in duration. . . . Moreover, . . . there would have been no reason for a jury to conclude that [Petitioner] would have merely kept up with traffic as Lyons did in his test drives . . . . [I]t is worth recalling that there was testimony that Permanian and [Petitioner] used the Pulsar for its speed, and spoke of driving at over 100 miles-per-hour from the crime scene to Indiana to dispose of the murder weapon and the clothes they wore at the time of the offense.

*People v. Kliner*, No. 1-04-0050, at 39-41 (Ill. App. Dec. 29, 2006).

Petitioner argues at length that the failure of Petitioner's trial counsel to investigate the drive time between Petitioner's office and the murder scene was deficient representation. However, he does not attempt to rebut the Illinois appellate court's conclusion regarding the second prong of *Strickland* – that the failure to present the evidence resulted in prejudice. As noted above, the appellate court concluded that presentation of drive-time evidence would not have affected the trial's outcome.

Turning to Petitioner's next argument regarding his ineffective assistance of trial counsel claim, Petitioner asserts that his trial counsel failed to sufficiently impeach the testimony of Rinaldi, Behenna and Apel, Sr.

With respect to Rinaldi, Petitioner argues that his trial counsel should have offered evidence that Petitioner and Rinaldi could not have had the conversations Rinaldi claimed occurred while the two were awaiting trial in Cook County jail, during which, according to Rinaldi, Petitioner made incriminating statements regarding the murder. Petitioner points to evidence uncovered by his post-conviction counsel, consisting of an order directing that Petitioner, Rinaldi and Permanian be kept separate, jail records regarding housing and transportation and affidavits from corrections employees and inmates.

With respect to Behenna, Petitioner argues that his trial counsel should have conducted cross-examination regarding a statement by the judge in the custody dispute between Behenna and Petitioner to the effect that Petitioner's right to see his son would be taken away only if the court heard evidence of a serious offense by Petitioner. Additionally, Petitioner argues that his trial counsel should have impeached Behenna's assertion that Petitioner confessed to her while in line for the Ferris wheel at Great America Amusement Park with the fact, not discovered by Petitioner until after the trial, that the Ferris wheel had been removed three or four years before that time. Finally, Petitioner faults his trial counsel for failing to refute Behenna's testimony that she remained silent regarding Petitioner's confessions to her because she was afraid of him. Petitioner identifies two witnesses who he claims could have testified that Behenna was not afraid of Petitioner but, rather, she was angry with him for ending their relationship.

10

With respect to Apel, Sr., Petitioner argues that three of Petitioner's relatives would have testified that Apel, Sr. threatened to implicate Petitioner in the murder. Petitioner argues that trial counsel should have called these individuals to testify.

The appellate court considered each of these arguments but held that they did not satisfy either prong of the *Strickland* test. With respect to the first prong, the court noted that "[a] defense attorney's cross-examination of a witness is considered unsound under *Strickland*'s first prong only if there is an utter failure to conduct any meaningful adversarial testing." The court noted that Petitioner's counsel had attempted to impeach the three witnesses in question, had pursued all grounds for bias identified by Petitioner, and that the evidence Petitioner claims should have been introduced were simply additional facts regarding impeachment along the same lines trial counsel attempted. Thus, the court concluded there had been no "utter failure" to conduct cross-examination. With respect to the second prong, the court held that Petitioner had not shown he was prejudiced by trial counsel's failure to introduce the impeachment evidence. The court wrote that it could not "accept [Petitioner's] contention that, with the refinements and modifications he now suggests, the jury necessarily would have voted to acquit."

Petitioner argues that the appellate court's ruling with respect to trial counsel's cross-examination of Rinaldi, Behenna and Apel, Sr. was an unreasonable application of Supreme Court precedent. That trial counsel did not discover or present the above-cited evidence, Petitioner argues, was a serious failure. Furthermore, Petitioner argues, use of the evidence in impeaching the three witnesses in question would have made a difference in the outcome.

However, Petitioner does not contest the legal standard applied by the appellate court –

that an attorney's cross-examination is unsound under *Strickland* only if there is an "utter failure"

to conduct any meaningful adversarial testing. Here, Petitioner cannot dispute that trial counsel

attempted to impeach Rinaldi, Behenna and Apel, Sr. along all lines of attack now suggested by

Petitioner. That the cross-examination could have been refined, or even significantly improved,

does not establish that the actual cross-examination was an utter failure.

Furthermore, it is not clear that the appellate court's holding with respect to the second

prong of *Strickland* was unreasonable. While it is conceivable that the evidence in question

might have added something to Petitioner's impeachment attempts, it is far from clear that it

would have made a difference. Petitioner's evidence regarding the plausibility of Rinaldi's

testimony would itself have been subject to attack by the State. Evidence that Apel, Sr. had

threatened to implicate Petitioner in the murder is not necessarily inconsistent with Petitioner

having made the alleged inculpatory statements to Apel, Sr. In any case, because Petitioner has

not shown that the appellate court's application of the first prong of *Strickland* was unreasonable,

consideration of the second prong is unnecessary.

Finally, Petitioner argues his trial counsel was ineffective because he failed to investigate

and present evidence that someone other than Petitioner committed the murder. Specifically,

Petitioner argues that trial counsel failed to investigate evidence that a friend of Rinaldi,

Charles Burnett, met Rinaldi and two other individuals known as "Mike" and "Psycho" while at

a club in 1988. According to Petitioner, the evidence showed that Rinaldi told Burnett that he

had hired Mike and Psycho to kill his wife. Other evidence would have established that

Permanian had a friend named James Ryan, whose nickname was "Psycho." Furthermore, Petitioner argues that while Burnett was able to identify Permanian as "Mike," he was not able to identify "Psycho."

Addressing this claim, the appellate court noted that Petitioner appeared to have dropped his assertion that trial counsel should have implicated James Ryan. The court then concluded that Petitioner's assertion that Burnett failed to identify Petitioner as Psycho in the police lineup rested on the speculative assumption that Petitioner's picture was among those police showed Burnett.

Petitioner has not shown that the appellate court's conclusion was contrary to or an unreasonable application of Supreme Court precedent. The claim is based on speculation as to what occurred at the lineup and what Burnett might have testified.

### Ex Parte Judge-Jury Communication

Petitioner argues that he was denied his Fifth, Sixth and Fourteenth Amendment rights to due process, to effective assistance of counsel and to a fair and public trial by jury when the trial court failed to inform him of six written notes sent by the jury to the judge. In the first note, the jury requested transcripts of opening statements and Rinaldi's testimony. The judge, without consulting Petitioner or counsel wrote back "No." The second note from the jury asked when certain photographs were taken. The judge, again without consulting Petitioner or counsel, wrote back "Feb. 1988." The remaining four notes related to the timing of the jury deliberations and the jury's comfort. Two notes, sent on different days, indicated that the jury was "done for today." In response to the second such note, the judge wrote back that transportation was coming

13

at 6:00 p.m. and that the jury should continue to deliberate until then. The judge also rejected a request that one juror be permitted to walk around the block for fresh air and ignored a note concerning poor accommodations at the hotel where the jury was staying.

The Illinois Supreme Court held that while the *ex parte* communication between the judge and jury was improper, no prejudice resulted to Petitioner. With respect to the request for transcripts, the court held that decision to provide or withhold transcripts was within the sound discretion of the trial court judge, and that the decision to withhold the transcripts did not prejudice Petitioner. With respect to the second note, regarding the date of the photographs, the court held that no prejudice had resulted because the trial court's response was factually consistent with the evidence presented at trial. Finally, with respect to the last four notes, the court rejected Petitioner's contention that the trial court's handling of the notes hastened the jury's verdict. The court noted that the notes requesting a walk around the block and protesting the poor accommodations came a day before the jury reached their verdict. It, thus, concluded that the trial court's response to the notes was not a factor in the jury's rendering of the verdict.

"[T]he proper inquiry is whether the *ex parte* communication had a prejudicial effect on the defendant and so infected the trial process as to make the trial as a whole fundamentally unfair." *Ellsworth v. Levenhagen*, 248 F.3d 634, 640 (7th Cir. 2001) (citations and quotations omitted). Petitioner has offered no plausible explanation as to how he could have been prejudiced by the trial court's responses with respect to either of the first two notes. Petitioner puts greater weight on the last four notes, which he claims "reveal a group of individuals increasingly frustrated with their accommodations." Petitioner argues that "the jury was distressed, and wanted to reach a verdict as soon as possible." Yet Petitioner's interpretation of

14

the notes is speculative, at best. As noted by the Illinois Supreme Court, the jury did not reach its verdict until the next day after the notes in questions. Thus, the Illinois Supreme Court's conclusion that Petitioner was not prejudiced by the *ex parte* communications was neither contrary to, nor an unreasonable application of, clearly established federal law.

*Right to Speedy Trial*

Petitioner argues that he was denied his rights under the Sixth and Fourteenth Amendments because 531 days passed between his arrest and the commencement of his trial. Respondent argues that this claim is procedurally defaulted because Petitioner failed to present it for one complete round of review by the Illinois state courts. Rather, Petitioner asserted only his statutory speedy-trial right under Illinois law. Petitioner counters that his appellate counsel's argument with regard to his speedy trial encompassed a claim under his Sixth and Fourteenth Amendment rights. However, as the Illinois Supreme Court noted, Petitioner argued the speedy-trial issue only on state-law grounds. Alternatively, Petitioner argues that his appellate counsel's failure to raise such an argument denied him his right to effective assistance of counsel. Thus, Petitioner argues, he can establish cause for his failure to raise his federal speedy-trial claim in state court. However, ineffective assistance of appellate counsel may establish cause for procedural default only if the ineffective assistance of counsel claim itself has been presented and appealed through the state courts. *Edwards v. Carpenter*, 529 U.S. 446, 453 (2000). Here, Petitioner has not presented a claim of ineffective assistance of counsel in state court. Thus, it cannot serve as cause to excuse his procedural defaults on this claim. Thus, Petitioner's speedy-trial claim is procedurally defaulted.

*Scope of Cross-Examination*

Petitioner argues that he was denied his Sixth and Fourteenth Amendment right to confront witnesses against him. Petitioner argues that the trial court violated his rights by preventing or limiting his cross-examination of Rinaldi and Behenna on certain topics.

First, Petitioner argues that he should have been permitted to cross-examine Rinaldi about his alleged use of tranquilizers during his testimony. Several days after Rinaldi's testimony, defense counsel informed the trial court that codefendant Permanian's mother had overheard one of the prosecutors telling police officers that Rinaldi had been tranquilized during his testimony. The prosecutor denied the allegation. The trial court took testimony from Mrs. Permanian, who could not remember the date of the conversation and could not describe the officers in question. She also admitted that she had waited several days before informing defense counsel. The trial court stated that she did not believe the allegations and denied Petitioner's request to recall Rinaldi for further cross-examination. Noting that the latitude permitted on cross-examination is a matter within the sound discretion of the trial court, the Illinois Supreme Court rejected Petitioner's claims that the trial court's ruling violated his rights.

The Illinois Supreme Court's ruling was neither contrary to, nor an unreasonable application of, clearly established federal law. "[T]rial judges retain wide latitude . . . to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986). Petitioner has not pointed to any Supreme Court precedent that would require a contrary result.

Second, with respect to Behenna, Petitioner argues that the trial court violated his constitutional rights when it granted the prosecution's motion *in limine*, preventing the defense from cross-examining Behenna, who had changed her name and relocated, about her name address, employment and social security number. Finding that the prosecution had shown that disclosure of that information might compromise Behenna's safety, the Illinois Supreme Court held that the trial court did not abuse its discretion in granting the prosecution's motion. The court distinguished *Smith v. Illinois*, 390 U.S. 129 (1968), the case relied on by Petitioner, which had held that the criminal defendant in that case had a right to inquire as to the real name and address of a State's witness, an informant and participant in illegal narcotics sales. The court distinguished *Smith* on the grounds that Behenna was already well known to Petitioner and that the prosecution had shown that her safety would be at risk should her new identity become known. In support of his *habeas* petition, Petitioner again cites *Smith* to support his position that he should have been permitted to inquire into Behenna's name, address, etc. However, he fails to explain how the Illinois Supreme Court's reading of the case was in error. Thus, the Illinois Supreme Court's ruling was neither contrary to, nor an unreasonable application of, clearly established federal law.

Finally, Petitioner argues that he should have been permitted to cross-examine Behenna about the terms of the visitation order concerning the child of Petitioner and Behenna. Petitioner argues that such testimony would have shown that Behenna had a motive to testify falsely. Specifically, Petitioner contends that Behenna's actions with respect to the visitation order "exposed her motive to see [Petitioner] convicted of murder so that [Behenna] could more easily

defeat his family's attempts to gain visitation." Reviewing Petitioner's claim, the Illinois

Supreme Court concluded that the limitation placed upon Petitioner in questioning Behenna had

been minor:

> Here, the trial court permitted defense counsel to question Behenna about
> [Petitioner's] family's attempts to obtain visitation rights with Behenna's son. The
> trial court merely limited defense counsel's inquiry into the terms of a visitation
> order. Despite this restriction, defense counsel was able to elicit from Behenna
> that there was ongoing litigation between herself and [Petitioner's] family
> regarding visitation rights with her son. This evidence was more than sufficient to
> point out to the jury Behenna's potential bias against [Petitioner]. We note,
> furthermore, that [Petitioner] was permitted a full cross-examination of Behenna
> in other respects. The jury was advised of information with which to make an
> informed decision about Behenna's motivation for offering false testimony. The
> jurors were informed that Behenna and [Petitioner] had ended their relationship.
> The jurors were also informed that Behenna had a sexual relationship with
> codefendant Permanian in 1991. In the context of this case, the restriction placed
> on defendant's cross-examination of Behenna by the trial court was minor.
> Therefore, we find that, even if the trial court erred in limiting Behenna's
> cross-examination regarding the terms of the visitation order, the error was
> harmless beyond a reasonable doubt.

*People v. Kliner*, 185 Ill.2d 81, 134-35 (1998). Petitioner has offered no convincing argument as

to how the Illinois Supreme Court's ruling on this issue was in error, contrary to, nor an

unreasonable application of clearly established federal law.

### *Alleged Due Process Violations*

Petitioner argues that his due process rights were violated when the prosecutor referred,

in closing argument, to evidence that had only been admitted against his codefendant, Permanian.

Specifically, the prosecutor stated that Behenna had worn a wire when speaking to Permanian

and that Permanian had patted Behenna down, looking for a wire. Defense counsel objected, and

the trial court instructed the jury to disregard the comment. Reviewing Petitioner's claim, the

Illinois Supreme Court held that the comments did not violate Petitioner's due process rights

because "no substantial prejudice accrued to [Petitioner]." Petitioner argues that the Illinois Supreme Court's holding was an unreasonable application of *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (*Darden*). In *Darden*, the Court held that "[t]he relevant question is whether the prosecutors' comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Darden*, 477 U.S. at 181 (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974) (*Donnelly*)). However, Petitioner offers no reason to question the Illinois Supreme Court's application of this principle. As noted by that court, the comment was only slightly prejudicial to Petitioner, if at all, and the trial court instructed the jury to disregard the statement.

Petitioner next argues that his due process rights were violated when the trial court admitted hearsay evidence from Apel, Sr. regarding Petitioner's confession to Joseph Sblendorio[1], Petitioner's grandfather and Apel, Sr.'s father-in-law. The Illinois Supreme Court addressed the argument as follows:

> On direct examination, John Apel, Sr., a witness for the State, testified that defendant had confessed to him in May of 1988 about the Rinaldi murder. During cross-examination, Apel recalled two occasions in March of 1993, when investigating officers interviewed him. On both occasions, he told the investigating officers that he had no "first hand" knowledge of the Rinaldi murder. He also told them that he had received all of his information about the case from Joe Splindorio, his father-in-law and [Petitioner's] grandfather. Apel then, admitted on cross-examination, that those statements to the investigating officers were false. Apel claimed to be afraid of [Petitioner]. Apel also admitted, on cross-examination, that in May of 1993, he finally told law enforcement officials about defendant's confession to him, following [Petitioner's] incarceration in Cook County jail.

---

[1]Petitioner states that this is the correct spelling of his grandfather's name. A different spelling was used by the Illinois Supreme Court and has not been altered in the Court's quotation of that opinion.

On redirect examination, the prosecution attempted to elicit Apel's testimony about a conversation he had with Splindorio. The trial judge found that defense counsel's cross-examination of Apel had "opened the door with regard to him [Apel] garnering his information from Splindorio." The trial judge therefore ruled, over defense objection, that the prosecutor could ask Apel if he had a conversation with Splindorio and if he gave out information that he gleaned from that conversation. The trial judge, however, precluded the prosecutor from going into the actual contents of the conversation. The following exchange thereafter occurred between the prosecutor and Apel on redirect examination:

"Q. * * * [D]id you ever have a conversation with Mr. Splindorio regarding the things you have testified to here?

A. Yes.

Q. And did you relay any of those facts or knowledge that you gleaned from that conversation to the police?

A. Yes, I did."

*People v. Kliner*, 185 Ill.2d 81, 149-50 (1998). Petitioner argued that these statements were

hearsay because the jury could deduce that Petitioner made inculpatory statements to Sblendorio,

who was not called as a witness.

The Illinois Supreme Court rejected this argument, reasoning that the statement was not

hearsay and that the prosecution's questioning on redirect was proper:

We agree with the State that Apel's testimony did not improperly introduce statements by Splindorio, but established simply that a conversation had occurred between Apel and Splindorio. Defense counsel opened the door on cross-examination to the conversation with Splindorio by suggesting that Apel never had the conversation with him. Consequently, the statement itself had legal significance on redirect since the State sought to rehabilitate Apel's credibility by proving that Apel had a conversation with Splindorio. Apel's testimony about the conversation, however, was not offered to establish the truth of the matters asserted in the conversation. It was offered only to show that Apel and Splindorio had a conversation. We therefore reject defendant's claim that he was denied a fair trial by the erroneous admission of hearsay testimony.

*People v. Kliner*, 185 Ill.2d 81, 150 (1998). Petitioner now contends that the court erred in concluding that there was a valid non-hearsay reason for admitting the testimony. However, the Illinois Supreme Court's decision was not contrary to, nor an unreasonable application of, clearly established federal law.

Petitioner next argues that his due process rights were violated when the trial court improperly admitted evidence that he pistol-whipped Behenna and then refused to allow the jury to hear that Petitioner was acquitted of armed violence charges arising from that allegation. On cross-examination of Behenna, defense counsel elicited that there had been an "occurrence" between her and Petitioner that led to her filing a complaint and to Petitioner's arrest. Defense counsel further elicited that although Behenna had sought protective orders against Petitioner, she had never brought up his role in the Rinaldi murder in seeking those orders. On redirect, the prosecution asked why Behenna had sought the orders of protection, and, over defense counsel's objection, Behenna answered that "there was an incident in July when he pistol whipped me."

The Illinois Supreme Court held that while the trial court's decision to admit the testimony was error, it was harmless beyond a reasonable doubt and was not so prejudicial as to deny Petitioner a fair trial. The court noted that the defense was able to impeach Behenna on re-cross-examination and challenge her credibility with respect to the incident.

Petitioner argues that the Illinois Supreme Court's ruling was an unreasonable application of Supreme Court precedent. In Petitioner's view, Behenna's testimony about the pistol-whipping was highly prejudicial. However, "the appropriate standard of review . . . on writ of

habeas corpus is 'the narrow one of due process, and not the broad exercise of supervisory power.'" *Darden*, 477 U.S. at 181 (quoting *Donnelly*, 416 U.S. at 642). Here, the trial court's error did not rise to the level of a denial of due process.

Petitioner now also claims that the trial court's ruling regarding the alleged pistol-whipping violated his right to confront witnesses. However, as Petitioner failed to present this claim to the state court, he has procedurally defaulted the claim. Furthermore, as discussed above, Petitioner cannot show cause for his default because his allegation of ineffective assistance of appellate counsel was never presented to the state courts.

Petitioner next argues that his due process rights were violated when the prosecution, during opening statements, discussed anticipated testimony regarding handgun purchases by Petitioner but failed to adduce the evidence at trial due to the trial court's exclusion of the evidence. The Illinois Supreme Court held that the comments were not reversible error:

> The prosecutor's statements, however, did not amount to reversible error. The prosecutor's remarks regarding these handguns did not result in substantial prejudice to [Petitioner]. The trial court instructed the jury both before opening statements and at the conclusion of the evidence that opening statements are not evidence and that the jury should disregard any statements not supported by the evidence. Moreover, the prosecutor presented no evidence concerning [Petitioner's] alleged prior possession and purchases of .22-caliber handguns to the jury. The prosecutor properly did not question Apel and Behenna about defendant's prior gun ownership in compliance with the court's order excluding such evidence. We therefore conclude that the prosecutor's opening statements did not deny [Petitioner] a fair trial.

*People v. Kliner*, 185 Ill.2d 81, 128 (1998).

The Illinois Supreme Court's holding on this issue is not an unreasonable application of clearly established federal law. In *Frazier v. Cupp*, 394 U.S. 731, 736 (1969) (*Frazier*) the Supreme Court stated that "not every variance between the advance description and the actual

presentation constitutes reversible error, when a proper limiting instruction has been given." In *Frazier*, the Court held that a defendant was not entitled to *habeas* relief when the prosecution summarized the anticipated testimony of a coconspirator and was then unable to call the witness at trial. *Frazier*, 394 U.S. at 733-37. Here, the prejudice to Petitioner, if any, was certainly no more than that to the defendant in *Frazier*. Thus, *habeas* relief is not warranted on that ground.

Petitioner argues his right to due process was violated by the trial court's denial of Petitioner's motion for a hearing concerning *ex parte* communications with the judge about security concerns and the judge's failure to recuse herself. Specifically, Petitioner sought a hearing on whether the trial judge had communicated with the sheriff's department and whether the judge had ordered additional security for herself. Petitioner has defaulted on this claim because his argument on the subject before the state court was based solely on state law. Petitioner argues that the ineffective-assistance-of-counsel claim provides cause for the default. However, because Petitioner never presented his ineffective-assistance-of-counsel claim to the state courts, it cannot excuse his procedural default of his claim regarding the judge's alleged *ex parte* communications.

Finally, Petitioner argues that the errors alleged in his petition, taken together, cumulatively violated his due process rights. However, Petitioner conceded that his claim based on the effect of cumulative errors discussed above was never presented to the state courts. Therefore, it is procedurally defaulted. Because Petitioner never presented his ineffective-assistance-of-appellate-counsel claim to the state courts, it cannot excuse his procedural default.

*Self Incrimination*

Petitioner argues that his Fifth Amendment privilege against self incrimination was violated when, in closing arguments, the prosecutor directed the jury's attention to Petitioner's failure to testify and failure to present an affirmative defense. Specifically, Petitioner objects to the prosecutor's statement:

> "The only witnesses who were brought in in [sic] rebuttal to say these people said something different to me were the witnesses brought in from Tyrone Miller and that wasn't even to say he said something different, just to say he couldn't have seen what he saw[;] and Ronald Russell. When Joe Rinaldi finished testifying, his testimony stands unrebutted."

*People v. Kliner*, 185 Ill.2d 81, 156 (1998). The Illinois Supreme Court rejected Petitioner's claim:

> We find that the prosecutor's comments in rebuttal were not intended or calculated to direct the jury's attention to [Petitioner's] failure to testify. The prosecutor responded to defense counsel's closing argument, which challenged the State's evidence against defendant, by summarizing the evidence presented by the defense. The prosecutor noted that the defense witnesses consisted of those who contradicted Tyrone Miller regarding Miller's ability to see someone in the parking lot on the night of the murder, and Ronald Russell, who attempted to impeach the testimony of Paul Skorupa regarding whether he saw the victim's car on the night of the murder. In particular, the comments referring to the "only" witnesses and Rinaldi's testimony being "unrebutted" were merely designed to characterize the evidence against defendant. These comments did not necessarily direct the jury's attention to defendant's failure to testify, and therefore were not improper.

*People v. Kliner*, 185 Ill.2d 81, 157 (1998). Petitioner argues that the Supreme Court's ruling on this point was unreasonable. "[I]ndirect references to the defendant's failure to testify are constitutionally impermissible if the language used was manifestly intended to be or was of such a character that the jury would naturally and necessarily take it to be a comment on the defendant's failure to testify." *Ben-Yisrayl v. Davis*, 431 F.3d 1043, 1048-49 (7th Cir. 2005)

(citations and quotations omitted). Here, the prosecutor's comments did not meet that standard. Thus, the Illinois Supreme Court's ruling was not an unreasonable application of clearly established federal law.

### Claims of Actual Innocence

Petitioner argues that he is actually innocent of the murder for which he was convicted and that a fundamental miscarriage of justice would result should the court fail to review his claims. To the extent that Petitioner seeks to argue his innocence as an independent ground for *habeas* relief, such a claim is not cognizable. *Herrera v. Collins*, 506 U.S. 390, 400 (1993) ("Claims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding."). Furthermore, to the extent that Petitioner asserts actual innocence to excuse his procedural default by showing a fundamental miscarriage of justice would occur, that attempt fails as well. At this stage, it is Petitioner's burden to show innocence. *Buie*, 341 F.3d at 626-27. Reviewing all evidence and arguments presented by Petitioner, it is clear he has not met that burden.

### CONCLUSION

For the reasons stated above, the petition for *habeas corpus* is denied.

Dated October 20, 2009

JOHN W. DARRAH
United States District Court Judge

25